1  Ryan Hamilton (SBN 291349)
2  HAMILTON LAW LLC
   5125 South Durango, Suite C
3  Las Vegas, Nevada 89113
   (702) 818-1818
4  Ryan@HamLegal.com
5
6  James Banker (SBN 317242)
   DIGITAL JUSTICE FOUNDATION
7  210 Flamingo Road, #424
   Las Vegas, Nevada 89169
8  (714) 722-5658
9  JimBanker@Gmail.com
10
11 *Attorneys for Plaintiff*

12
13 **IN THE UNITED STATES DISTRICT COURT**

14 **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| 15  SUPERAMA CORPORATION, INC. D/B/A USA SUMO, | Case No. 2:22-cv-00299-MWF (JC) |
| 16  *Plaintiff*, | **First-Amended Complaint for** |
| 17 | • **Violations of U.S. Anti-Circumvention Laws, 17 U.S.C. § 1201** |
| 18  vs. | |
| 19  TOKYO BROADCASTING SYSTEM TELEVISION, INC., DOES 1-10, | • **Violations of the Japanese Copyright Act of 1970** |
| 20  *Defendants*. | |
| 21 | **DEMAND FOR JURY TRIAL** |
| 22 | |

23      Plaintiff Superama Corporation, Inc., d/b/a USA Sumo ("Superama" or
24 "Plaintiff") for its Complaint against Defendant Tokyo Broadcasting System
25 Television, Inc. and Does 1-10 (collectively "TBS" or "Defendants"), hereby alleges
26 the following:

27
28

# CONTENTS

NATURE OF THE CASE ........................................................................... - 4 -

PARTIES TO THE ACTION ...................................................................... - 4 -

JURISDICTION & VENUE ........................................................................ - 5 -

FACTUAL ALLEGATIONS ....................................................................... - 6 -

I. CIRCUMVENTION OF A TECHNOLOGICAL MEASURE CONTROLLING ACCESS TO A WORK PROTECTED UNDER TITLE 17, 17 U.S.C. § 1201(A)(1)(A) ................- 6 -

    A. Person Governed by §1201(a)(1)(A) ........................................ - 6 -

    B. Work Protected Under Title 17 ................................................. - 6 -

    C. §1201(a)(3)(B) Technological Measure.................................... - 8 -

    D. §1201(a)(3)(A) Circumvention ................................................ - 13 -

    E. §1201(a)(1)(A) Effective Date ................................................. - 14 -

    F. §1201(a)(1)(C) Rulemaking..................................................... - 14 -

    G. Person  Injured by Violation ................................................... - 15 -

II. INFRINGING CONDUCT IN VIOLATION OF THE JAPANESE COPYRIGHT ACT OF 1970, AS AMENDED. ......................................................................- 17 -

    A. TBST hacks Superama's copyrighted works to prepare them for infringement on national television.......................................... - 17 -

    B. TBST performs and displays derivatives of Superama's works. ............ - 18 -

    C. TBST unauthorized derivatives and performance cause profound harm to Superema's standing, honor, and reputation in Japan......................... - 18 -

CAUSES OF ACTION ............................................................................... - 19 -

JURY DEMAND ........................................................................................ - 23 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Amended Complaint

## NATURE OF THE CASE

1. This is an action for anti-circumvention and copyright infringement. The anti-hackin / anti-circumvention violations arise under U.S. law. The infringement actions arise under Japanese law. TBS, a large national broadcaster in Japan, decided it didn't want to do the right thing by paying for a license to use Superama's copyrighted works when it wanted to broadcast them nationally throughout Japan. Broadcasting someone else's video without authorization for commercial use is indisputably copyright infringement and because it broadcast in Japan, the infringement causes of action arise under Japanese law. Conversely, because the server hosting the plaintiff's material, the technological measure protecting that material, and the circumvention of those measures all occurred here in the United States, the circumvention claims all arise under U.S. law.

## PARTIES TO THE ACTION

2. **Plaintiff.** Superama is a corporation incorporated under the laws of the State of Nevada. Superama's principal place of business and operations is Los Angeles County, California. Superama organizes, stages, presents, promotes, *etc.*, sumo wrestling within the United States. In the course of these operations, Superama creates a number of copyrighted works. Under Japanese law, Superama is both the performer and broadcaster of the copyrighted works it creates in the course of its operations.

3. **Defendants.** As further investigation will likely show, Defendant Tokyo Broadcasting System Television, Inc. ("TBST") is a corporation formed under the laws of Japan. As further investigation will likely show, Defendant Does 1-10 are corporate or natural persons who assisted TBST in the tortious acts described herein, both in the United States and in Japan.

Amended Complaint

## JURISDICTION & VENUE

4.  **Federal Question Jurisdiction.**  The U.S. anti-circumvention cause of action arises under a federal law related to copyright.  *See* 17 U.S.C. §§ 1201, 1203. Therefore, this Court has exclusive subject-matter jurisdiction over Superama's federal cause of action.  *See* 28 U.S.C. §§ 1331, 1338(a).

5.  **Supplemental Jurisdiction.**  The Japanese causes of action for violation of Superama's Japanese economic rights, moral rights, and technological-restriction-measure rights arise under the Japanese Copyright Act of 1970, as amended.  These claims are so related to the U.S. anti-circumvention claims as to form part of the same case or controversy.  Therefore, this Court has supplemental jurisdiction over the Japanese claims.  *See* 28 U.S.C. § 1367(a). The supplemental jurisdiction of this Court over these Japanese claims is hereby asserted.  *See* 28 U.S.C. § 1367(d).

6.  **Personal Jurisdiction.**  TBST has submitted to the personal jurisdiction of this Honorable Court by operation of Rule 12(h) of the Federal  Rules of Civil Procedure.  *See* Fed. R. Civ. P. 12(h)(1)(A)-(B).  Moreover, even if TBST had not so submitted, it is subject to the claim-specific jurisdiction of the  Superior Court California for its tortious actions here.  *See* Cal. Code Civ. Pro. § 410.10. Therefore, pursuant to Rule 4(k)(1)(A) of the Federal Rule of Civil Procedure, this Court has TBST based upon service thereof.

7.  **Venue.**  A substantial part of the events giving rise to the claims asserted herein occurred in Central District of California.  Therefore, this Court is a proper venue.  *See* 28 U.S.C. § 1391(b)(2).  In the alternative, venue lies here because TBST is subject to the Court's personal jurisdiction with respect to this action. *See* 28 U.S.C. § 1391(b)(3).

# FACTUAL ALLEGATIONS

**I.    CIRCUMVENTION OF A TECHNOLOGICAL MEASURE CONTROLLING ACCESS TO A WORK PROTECTED UNDER TITLE 17, 17 U.S.C. § 1201(a)(1)(A)**

8.    TBST has violated the anti-circumvention provisions of the United States Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 1201 *et seq.*  Specifically, TBST has contravened federal law by circumventing a technological measure that effectively controls access to a work protected under Title 17 of United States Code.

## A.    Person Governed by §1201(a)(1)(A)

9.    Section 1201(a)(1)(A)'s prohibition against circumventions of technological measures governs the conduct of any "person."  17 U.S.C. § 1201(a)(1)(A).  In legal contexts, as here, the word "person"  includes "corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals."  1 U.S.C. § 1.

10.    TBST is a person as defined.  TBST is a corporation or company formed under the laws of Japan.  Therefore, TBST is governed by §1201(a)(1)(A)'s prohibition on circumvention.

## B.    Work Protected Under Title 17

11.    Section 1201(a)(1)(A)'s prohibition against circumvention of technological measures applies to any "work protected under" Title 17 of U.S. Code.  In turn, a work is protected under Title 17 when it contains original expression, *see* 17 U.S.C. § 102, and when it also meets the statutory national-origin requirements, *see* 17 U.S.C. § 104.

12.    Superama's works are works protected under Title 17.  They are original works of expression, duly registered by the U.S. Copyright Office, owned and authored by a U.S. domiciliary.

### i. *Originality*

13. Superama's copyrighted works in suit meet the originality requirements necessary to be copyrighted works. Specifically, Superama did not copy the works from another source; they are original works of art. Moreover, through its employees working in the scope of their employment, Superama selected original subject matter (specific images and series of images of U.S.-based sumo wrestling tournaments), selected the equipment and settings that it would use to record and fix this subject matter, captured this subject matter from chosen camera angles with certain focuses, *etc.* This list of decisions is illustrative, and not exhaustive, of the creative judgments and decisions that Superama made in authoring the copyrighted works at issue. Under the statutory categorization of types of copyrighted works used in Title 17, these copyrighted works constitute "motion pictures" and "pictorial" works, as those terms are defined in the U.S. Copyright Act. *See* 17 U.S.C. § 102(a)(5)-(6), *see also* 17 U.S.C. § 101 (defining these terms).

### ii. *Registration*

14. Superama's works in suit are registered works by the U.S. Copyright Office. Superama's motion-picture work has been registered by the U.S. Copyright Office in registration Class PA, with registration number **PA 2-166-692**. Likewise, Superama's pictorial work has also been registered with by the U.S. Copyright Office in registration Class VA, with the registration number **VA 2-147-033**. Thus, the Register of Copyrights has determined each of Superama's work in suit "constitutes copyrightable subject matter" under Title 17 of U.S. Code. *See* 17 U.S.C. § 410(a).

15. Moreover, Superama's works in suit were registered in under five years before they were published (but taking no position on whether they have been published). As a result, these works are presumptively copyrightable and

presumptively original by operation of law due the Register of Copyright's certificate.  *See* 17 U.S.C. § 410(c).

### iii.  *Domicile / Nationality*

16.  To the extent that Superama's works were unpublished during the relevant periods, they were protected under this Title 17.  Any work, "while unpublished, is subject to protection under Title 17 and is, therefore, the type of work protected by §1201(a)(1)(A).

17.  In the alternative, and to the extent that Superama's works were published during the relevant periods, they were nonetheless still protected under Title 17. Superma's works were created by its employees operating within the scope of their employment, so Superama is "considered the author" for purposes of Title 17.  17 U.S.C. § 201(c).  In turn, Superama is a "domiciliary of the United States," 17 U.S.C. § 104(b)(1), because Superama is domiciled here, with its place of incorporation being the State of Nevada and its principal place of business being in the State of California.

18.  Thus, Superama's works are works protected under Title 17—*i.e.*, works protected under this tile.

## C.    §1201(a)(3)(B) Technological Measure

19.  Section 1201(a)(1)(A) protects from circumvention any "technological measure that effectively controls access to a work."  17 U.S.C. § 1201(a)(1)(A).  In turn, Section 1201(a)(3)(B) clarifies that a technological measure effectively controls when, in the ordinary course of its operation, it requires "the application of information, or a process or a treatment, with the authority of the copyright owner" to gain further access to that work.  17 U.S.C. § 1201(a)(3)(B).  A typical example is a password.

20. Superama maintains a website that it uses to *display* and *perform* its copyrighted materials, but to do so without allowing rampant and unauthorized downloads, *i.e.*, *reproduction*, of its copyrighted works.

21. Superama is a U.S.-based company with a principal place of business and a place of incorporation in the United States. As further investigation will likely fully demonstrate, when Superma registered with a web-hosting to host its website online, Superama made clear through it's the information and forms that it expressly provided that it was a U.S.-based company. Moreover, as further investigation will likely fully demonstrate, the web-hosting service used a series of Internet cookies, data trackers, geographical indicators, IP-address tracking, and other means of discerning location, that Superama was a U.S.-based company. Through this information, the web-hosting service likely discerned Superama's actual location and received further confirmation through Superama's choice of a uniform-resource locator (or "url"—*i.e.*, google.com rather than an IP address) that Superama was a U.S.-based company. Indeed, investigation will likely demonstrate that the web-hosting company it itself a U.S.-based company that serves primarily a U.S. market, with U.S. customers (or foreign customers that are trying to reach U.S. markets using U.S. urls), that the web-hosting company's default rule is to serve U.S. websites, especially when the web-hosting company is access via a U.S.-based url, and that the web-hosting company acted in accordance with its policies and treated Superama, accurately, a U.S.-based company. Accordingly, as further investigation will likely demonstrate, the web-hosting service determined correctly that Superama was a U.S.-based company, determined correctly that most of Superama's web traffic to its website was likely to be U.S.-based web traffic, and accordingly hosted Superama's website on a U.S.-based web server. Accordingly, when the web servers are accessed, the person accessing Superama's website is interacting with a type of computer (called a server) located inside the United States and that primarily serves U.S.-based audiences.

Amended Complaint

22. Superama, however, did not want any person who accessed its web servers to have the access to download the copyrighted material from Superama's website itself. To accomplish this, Superama endeavored to limit those who visited its website from gaining access to a downloadable copy of the files containin the works (rather than merely be able to display or stream them directly on Superama's website). This is akin to how streaming websites like Spotify (for music) or Netflix (for video) will allow you to play it on their website (or even download files within an app), but do not permit users to create a separate copy of the copyrighted material. Likewise, it is similar to how DVDs will allow users to play a movie on a DVD-player, but will restrict copying or reproducing the material on the DVD. Like other services (*e.g.*, Spotify, Netflix) that allow the display or performance of copyrighted material to the public but do not permit users access to reproduce the material by creating a separate standalone file with the material, YouTube also provides these services. For example, YouTube uses software code that will load and perform videography on a streaming basis, but will not permit the Internet browser to reproduce and download the copyrighted material as a separate standalone file independent and apart from the website it was hosted on. *See*, *e.g.*, *Yout, LLC v. Recording Indus. Ass'n of Am., Inc.*, 633 F. Supp. 3d 650, 667 (D. Conn. 2022) ("YouTube's standard service does not allow users to download the videos or audio files streamed on the watch pages, and users are faced with technological obstacles in accessing the media-file URLs in the media page source codes."); *UMG Recordings v. Kurbanov*, 2021 U.S. Dist. LEXIS 250844, *10-11 (E.D. Va. Dec. 16, 2021) (same). Accordingly, Superama uploaded its copyrighted materials onto YouTube and then YouTube applied these technological measure to Superama's videos. In their ordinary operation, YouTube's technological measures are effective blocking Internet browsers from gaining access to the works to download them in a separate standalone file, independent from either YouTube or the website they're viewed upon.

23. To understand this ordinary operation, it's worthwhile to contrast downloading a video from a website that does not use these technological measures. Without YouTube's technological measures, reproducing a copyrighted work into a separate standalone file on the downloader's computer is as easy as right-clicking on the streaming material and then clicking to download it. By contrast, YouTube's technological measures do not allow ordinary users to use a right-click download to copy a separate file because they function through software code that interacts with Internet browsers to block such acts. Most users can easily download materials from the Internet without these download restrictions, but cannot do so with them. Thus, in their ordinary course of operation, most users are limited. Certain hacking techniques can be employed to get around YouTube's technological measures by using highly sophisticated software called "stream-ripping" software that essentially password-hacks the websites restrictions on the download. When Superama uploaded its copyrighted material onto YouTube, YouTube then applied its technological measures to that material, such that the material was download-restricted, in the same way that Netflix, Spotify, *etc.*, block wholesale downloading from their websites into separate files even though they permit streaming.

24. As further investigation will likely demonstrate, YouTube—a website and service run by one of the most technologically sophisticated companies on the planet—has all the same abilities to discern that Superama was a U.S.-based company, that its web-traffic and audiences were predominantly U.S.-based, and that hosting the vides on U.S.-based web servers would increase the speed of loading them for most viewers and save YouTube money in its operations. Accordingly, as further investigation will demonstrate, YouTube also hosted the videos in the United States, on U.S.-based web servers, and applied its technological measures inside the United States, to United States works. Indeed, Furthermore, YouTube's application of these measures ensured that the only way to download a file of Superama's works was to circumvent the technological

1    measures—technological measures that YouTube created, applied, and hosted

2    here in the U.S. to works created and hosted by YouTube here in the U.S.

3    25.  In turn, YouTube allows its users to embed videos on their website, essentially

4    to show YouTube videos directly on their website by means of YouTube. *E.g.*,

5    *Goldman v. Breitbart News Network, LLC*, 302 F. Supp. 3d 585, 587 (S.D.N.Y.

6    2018) ("Most social media sites—Facebook, Twitter, and YouTube, for

7    example—provide code that coders and web designers can easily copy in order

8    to enable embedding on their own webpages."); *United States v. Keys*, 2021 U.S.

9    Dist. LEXIS 76008, *3 (C.D. Cal. Apr. 19, 2021) ("embedded links to YouTube

10   videos").  A major advantage of doing so is that the videos will have the

11   technological measures that restrict download, even when displayed or

12   performed on another website.  Superama embedded the YouTube videos that

13   displayed or performed its copyrighted works on its website via YouTube's

14   embed functions.  Accordingly, whenever anyone went to Superama's website,

15   they could not reproduce Superama's copyrighted material due to YouTube's

16   technological measures without hacking around those measures using stream-

17   ripping hacking tools.  And, because both YouTube's videos and Superama's

18   website were hosted on web servers in the United States, Superama's website,

19   the technological measure protecting its copyrighted material on its website, and

20   the copyrighted materials themselves could not be accessed except by means of

21   hacking into or around technological measures (which here are software code on

22   U.S.-based servers of YouTube and of Superama's web-hosting service)

23   protecting U.S. copyrighted material (again, which here are different kinds of

24   software code housed in U.S.-based servers) by means of U.S.-based websites

25   (with a U.S. url).  The only other possible way around them is with the authority

26   or permission of YouTube or Superama, which TBST did not have and did not

27   obtain.

28

### D.    §1201(a)(3)(A) Circumvention

26.  Section 1201(a)(1)(A) forbids persons from circumventing technological measures.  17 U.S.C. § 1201(a)(1)(A).  In turn, Section 1201(a)(3)(A) clarifies that to circumvent means to "descramble, "decrypt," "avoid, bypass, remove, deactivate, or impair a technological measure, without the authority of the copyright owner."  17 U.S.C. § 1201(a)(3)(A).

27.  TBST circumvented YouTube's technological measures.  As further investigation will likely show, TBST and its employees obtained a stream-ripping technology.  That stream-ripping technology was directed to the U.S.-based  webserver hosting Superama's website, was directed to the location on the U.S.-based webserver hosting Superama's website where tit hosted Superama's copyrighted materials and where it also had implemented YouTube's technological measures.  Again, all of these were located in the U.S. based upon decisions of Superama, Superama's webhost, and YouTube, applying standard materials.  Once the stream-ripping technology TBST used identified the material that TBST wanted to download in a separate file, TBST's stream-ripping software analyzed YouTube's download restrictions and then sent information and applied a software process to enable the reproduction by means of a separate download into a separate and standalone file.  The stream-ripping software supplied an unauthorized code to TBST and TBST's browser, which the browser then sent to the U.S.-based web server housing Superama's website, its materials, and the YouTube technological protection measures restricting TBST's access to download those files, such that once the code was implemented and interacted with the U.S.-based server housing Superama's website, its copyrighted materials, and the YouTube technological measures, the technological measures were avoided and bypassed (in the sense that TBST was able to load Superama's website from the server as though the technological measures did not apply) and deactivated and impaired (in the sense that TBST

was able to exactly what the technological measures sought to limit Internet browsers like TBST from doing, *i.e.*, reproducing Superama's copyrighted work in a separate download file that can be used independent of Superama's website. Accordingly, TBST circumvented the YouTube technological measures. TBST accomplished this by targeting its stream-ripping and circumvention software at the U.S.-based webserver hosting Superama's website, hosting Superama's copyrighted materials, and hosting YouTube's technological measure applied to those materials. It specifically directed its circumvention software to those locations, with the full knowledge that these were U.S.-based materials.

### E.    §1201(a)(1)(A) Effective Date

28.    Chapter 12 of Title 17 of United States Code was enacted on October 28, 1998. Section 1201(a)(1)(A) did not become effective until "the end of the 2-year period beginning on the date of the enactment"—*i.e.*, until October 28, 2000. 17 U.S.C. § 1201(a)(1)(A).

29.    All the facts and conduct described herein took place on or after October 28, 2000, and such conduct is therefore within the period when the prohibitions described in Section 1201(a)(1)(A) had become effective, legally binding, *etc.*, upon the Parties.

### F.    §1201(a)(1)(C) Rulemaking

30.    Section 1201(a)(1)(A) does not apply to certain specific types of copyrighted works in certain specific types of situations, when those types are adopted and set forth by the Librarian of Congress through a formal administrative rulemaking. *See* 17 U.S.C. § 1201(a)(1)(B), (C). The Librarian's exceptions to §1201(a)(1)(A) are codified in the Code of Federal Regulations and found at 37 C.F.R. § 201.40(b).

31.    These exceptions do not apply here.

32. For most of the exceptions, Superama's works are not among the types of works within the ambit of the exception.  For example, Superama's works are not literary works or computer programs or video games, so most of the exemptions are simply inapplicable to Superama's works.  *E.g.*, 37 C.F.R. § 201.40(b)(5)(i) ("Literary works"), (b)(6)(i) ("Literary works or previously published musical works"), (b)(7) ("Literary works"), (b)(8)-(b(17) ("Computer programs"), (b)(18)(i) ("Computer programs"); (b)(19)(i) ("Video games in the form of computer programs").

33. For those exceptions that *do* apply to motion pictures, TBST is either not the type of entity eligible for the exception or TBST's uses are not the type of use exempted.  TBST is plainly not a "college and university faculty," 37 C.F.R. § 201.40(b)(1)(ii)(A), is plainly not a "disability services office," 37 C.F.R. § 201.40(b)(2)(i)(A), is plainly not a nonprofit "library, archives, or museum," 37 C.F.R. § 201.40(b)(3)(i), and is plainly not a "a researcher affiliated with a nonprofit institution of higher education," 37 C.F.R. § 201.40(b)(4)(i)(A). Likewise, TBST's use is not "parody." *See* 37 C.F.R. § 201.40(b)(1)(i)(A), *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 580 (1994) (defining parody to require "comment on that author's <u>*works*</u>"); *id.* at 597 (Kennedy, J., concurring) ("The parody must target the original, and not just its general style, the genre of art to which it belongs, or society as a whole[.]").  Nor did TBST make use of Superama's copyrighted works in "noncommercial videos," 37 C.F.R. § 201.40(b)(4)(i)(B), or in "nonfiction multimedia e-books," 37 C.F.R. § 201.40(b)(4)(i)(C).

## G.    Person Injured by Violation

34. Section 1203(a) authorizes a private right of action for any "person injured by a violation of section 1201."  17 U.S.C. § 1203(a).  In legal contexts, as here, the word "person"    includes "corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals."  1

U.S.C. § 1.   Likewise, injury includes, *inter alia*, physical harms, monetary harms, and reputational harms.  *See*, *e.g.*, *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021).

35.   Superama is a person injured by the violation of §1201 and, accordingly, is authorized by statute to institute a civil action against the §1201 violator under §1203(a).   Superama is a person as defined because Superama is a corporation and company formed under the laws of the State of Nevada.   Likewise, Superama has been injured as a result of the §1201 violation, suffering monetary and reputational harms.   As a result of the violation, Superama lost money it would otherwise have had because valuable expression that was exclusively used by Superama in limited locations was rendered accessible for infringement—*viz.*, infringement that was undertaken without payment of any royalty or licensing fee.   Likewise, Superama suffered reputational injury insofar as its works lost exclusivity and then that loss of exclusivity was further used destroy Superama's reputation.

36.   TBST did not have the authority of the copyright owner to undertake these activities.   As to all relevant works, Superama is the copyright owner.   And, Superama did not authorize any of these actions.

\* \* \* \* \*

37.   Thus, TBST violated §1201(a)(1)(A).

38.   Notably, Superama does not know the precise chronology of events insofar as it has not undertaken discovery, but the above happened first as discovery will show and the subsequent download to Japan, format-shifting in Japan, and broadcast in Japan occurred subsequent to the circumvention of the download restrictions.

Amended Complaint

## II. INFRINGING CONDUCTION IN VIOLATION OF THE JAPANESE COPYRIGHT ACT OF 1970, AS AMENDED.

### A. TBST hacks Superama's copyrighted works to prepare them for infringement on national television.

39. On information and belief, ***after*** TBST circumvented the download restrictions described above, it then downloaded a separate file to its computers in Japan. From there, it further hacked the downloaded file and format shifted Superama's copyrighted works to render them susceptible to TBST's further uses and later infringements, *i.e.*, preparation of derivatives and later national broadcast of them.

40. Superama relied upon a number of technological exploitation restriction measures to control and limit how, when, and by whom its copyright protected content could be viewed. Defendant circumvented these technological exploitation restriction measures in the process of its unauthorized acts of infringements and broadcasts of Superama copyright protected content. These circumventions occurred, on information and belief, after TBST had already ripped the copyrighted works from YouTube.

41. In order facilitate it's infringement of Superama's copyright protected content, TBST ripped the content from those online, internet based sources and reformatted the content so that Defendant could make their unauthorized public broadcast of distorted versions of Superama's copyright protect content. That process likely included a number of necessary technological steps such as changing file formats and format shifting to render Superama's online video content suitable for and susceptible to TBS' television based broadcast. Format shifting refers to the conversion of media files from one file format into another format.

**B.    TBST performs and displays derivatives of Superama's works.**

42. After TBST circumvented the download restrictions and then downloaded Superama's copyrighted materials and then hacked it to further format-shift it, TBST then created and displayed the unauthorized derivative format of the works.    Then, Defendant broadcast throughout the country of Japan its unauthorized, heavily distorted derivative of the Work. The unauthorized derivative was broadcast on prime-time television on a prominent television program. Defendant's derivative distorted the work and provided no credit or copyright notices crediting USA Sumo during the performances and displays of the unauthorized derivatives.

43. These performances and displays of the unauthorized derivative contained distortions of the Work, failures to preserve the integrity of the Work, and were accompanied by extensive misinformation about USA Sumo that were deeply harmful to decades of creating its reputation there.

**C.    TBST unauthorized derivatives and performance cause profound harm to Superema's standing, honor, and reputation in Japan.**

44. These nationwide exploitations of the work were prejudicial to the honor or reputation of Superama, especially in the Japanese market, because they made false suggestions about Superama and how it conducted it sumo-wrestling tournaments and operations.

45. The exploitation of a work in a way that is prejudicial to the honor or reputation of the author is deemed to constitute an infringement of the author's moral rights.

# CAUSES OF ACTION

## Violations of the U.S. Digital Millennium Copyright Act
**Injury from Circumvention of a Technological Measure
that Effectively Controls Access to a Copyrighted Work
[17 U.S.C. §§ 1201, 1203]**

**Claim 1: TBST circumvented of a technological measure that effectively controls access to a copyrighted work.**

46. Superama hereby repeats and realleges paragraphs alleged above.

47. YouTube's restrictions on viewing, reproduction, *etc.* are technological measures that effectively control access to copyrighted works. <u>Cf.</u> 17 U.S.C.§ 1201(a)(3)(A).

48. TBS' successful efforts to descramble, decrypt, avoid, bypass, remove, deactivated, and/or impair YouTube's technological measures circumvented them. <u>Cf.</u> 17 U.S.C. § 1201(a)(3)(A).

49. The works TBST obtained greater access to through its circumvention are protected under Title 17 of the United States Code. <u>Cf.</u> 17 U.S.C. § 102(a).

50. As the copyright holder, Superama is a person injured by such acts. <u>Cf.</u> 17 U.S.C. § 1203(a).

51. **Claim 1:** TBST violated 17 U.S.C. § 1201 by circumventing technological protection measures that protect copyrighted works.

## Violations of the 1970 Copyright Law of Japan
**Technological Protection Measures
[Articles 113-3, *etc.*]**

**Claim 2: TBST circumvented copyright protection measures even after it ripped and downloaded from U.S.-based servers to its own servers.**

52. Superama hereby repeats and realleges paragraphs alleged above.

53. The Japanese copyright act forbids the circumvention of technological restriction measures for commercial purpose.

Amended Complaint

54. On information and belief, TBST circumvented those measures in Superama's files even it had downloaded the copyrighted works from U.S.-based servers.

55. **Claim 2:** TBST violated Japanese anti-circumventions laws.

## Violations of the 1970 Copyright Law of Japan
### Economic Rights Violations
**[Articles 21, 22, 22-2, 23, 24, 25, 26, 27, 28, 91, 92, 95, 96, 96-2, *etc.*]**

**Claim 3: TBST infringed Superama's Japanese economic rights by downloading, preparing derivatives, publicly performing, *etc.***

56. Superama hereby repeats and realleges paragraphs alleged above.

57. Under Japanese law, Superama is the copyright owner of the copyrighted works at issue here.

58. Superama did not authorize TBST to undertake any acts that require authorization under the Japanese copyright act.

59. TBST undertook those acts, including but not limited to reproducing the works, preparing derivatives of the works, publicly broadcasting the works, making those works available, *etc.*

60. **Claim 3:** TBST infringed Superama's Japanese economic rights.

## Violations of the 1970 Copyright Law of Japan
### Moral Rights Violations for Attribution, Integrity,
**[Articles 18, 19, 20 90-2, 90-3, *etc.*]**

**Claim 4: TBST infringed Superama's Japanese moral rights by undertaking actions that cause profound reputation harm to Superama's reputation as an author and performer.**

61. Superama hereby repeats and realleges paragraphs alleged above.

62. Under Japanese law, Superama has moral rights in its copyrighted creations that must be respected inviolate.

63. Superama did not authorize TBS to cause profound reputation harm, to sunder the integrity of its works, to use the works with misattribution or non-attribution, etc., and did so for a commercial purpose.

64. TBS engaged in all those actions.

65. **Claim 4:** TBS violated Superama's Japanese moral rights.

## VI. PRAYER FOR RELIEF

WHEREFORE, Superama prays for judgment in its favor and against TBS and the Does for any and all relief that is permitted, up to and potentially including:

66. **Declaratory Relief**: That the Court, if permitted,

    a.  Declare whether Superama legal author and legal owner of the copyright in the works under Japanese and U.S law.

    b.  Declare whether TBS circumvented measure of technological protection under Japanese and U.S. law.

    c.  Declare whether TBS infringed

    d.  Declare whether Eastern has violated Superama's moral rights.

67. **Money Damages, Costs, and Fees**: That the Court, if permitted,

    a.  Award Superama money damages, either actual damages and infringer's profits, cf. 17 U.S.C. § 1203(c)(2), or statutory damages, cf. 17 U.S.C. § 1203(c)(3)(A), in an amount to be determined after trial.[1]

    b.  Award Superama a reasonable attorney's fee.  Cf. 17 U.S.C. § 1203(b)(5).

    c.  Award Superama costs.  Cf. 17 U.S.C. § 1203(b)(4).

    d.  Award appropriate monetary remedies for violations of Japanese economic, moral, and anti-circumvention rights provided for in the

---

[1] Superama hereby reserves making its election between the actual damages or statutory damages until after a verdict is rendered at trial.

Japanese copyright laws.  E.g., for the infringements of Superama's copyrights—i.e. economic rights--as protected under Art.21-28, Art. 98, etc.. Superama seeks economic remedies and injunctive remedies pursuant to Art. 114, etc.  For the infringements of Superama's attribution and/or integrity rights—i.e.—moral rights, as protected under Art. 18-20 and Art. 90-2 and Art. 90-3, etc., Superama seeks economic remedies, injunctive remedies, and measures of restoration of honor and reputation pursuant to Art. 114, Art. 115, *etc*.  For the infringements and violations of Superama's technological protection measures, in violation of Art. 113(3), Superama seeks economic remedies and injunctive remedies, pursuant to Art. 113, 114, etc.

68. **Injunctive Relief**: That the Court, if permitted and where necessary to provide a remedy where money damages cannot adequately and sufficiently compensate Superama:

    a.  Grant a preliminary and a permanent injunction preventing and restraining further violations.  Cf. 17 U.S.C. § 1203(b)(1).

    b.  Order the impoundment of devices or products in the custody or control of a defendant where there is reasonable cause to believe were involved in the violations.  Cf. 17 U.S.C. § 1203(b)(2).

    c.  Order the destruction or remedial modification of device or products involved in circumvention.  Cf. 17 U.S.C. § 1203(b)(6).

    d.  Award appropriate injunctive remedies for violations of Japanese economic, moral, and anti-circumvention rights provided for in the Japanese copyright laws under Article discussed above.

69. **Other Relief**: That the Court, if permitted,

    a.  Grant any other relief permitted by law.

**JURY DEMAND**

70. Superama hereby demands a trial by jury of all issues so triable.


*/s/ Ryan Hamilton*
Ryan Hamilton

DATED: November 14, 2024        Respectfully submitted,

*/s/ Ryan Hamilton*
Ryan Hamilton (SBN 291349)
HAMILTON LAW LLC
5125 South Durango, Suite C
Las Vegas, Nevada 89113
(702) 818-1818
Ryan@HamLegal.com

*Attorney for Plaintiff*

Amended Complaint